Shirley DiLORETO and Wendall K. Littles, Plaintiffs,

v.

BOROUGH OF OAKLYN; Patrolman Robert A. Kane, Individually and as to the Arresting Officer; Patricia Walsh, Individually and as an Officer of Haddon Township, Defendants.

Civ. A. No. 88–4489(SSB).

United States District Court, D. New Jersey.

Aug. 21, 1990.

---

Puff & Aimino by Michael A. Aimino, Woodbury, N.J., for plaintiffs Wendall K. Littles and Shirley DiLoreto.

Montano, Summers, Mullen, Manuel & Owens by F. Herbert Owens, III, Cherry Hill, N.J., for defendant Borough of Oaklyn.

Martin, Crawshaw & Mayfield by John R. Riordan, Westmont, N.J., for defendant Robert A. Kane.

Schuenemann, Gercke, Dumser & Feld by John R. Gercke, Cherry Hill, N.J., for defendant Patricia Walsh.

## OPINION

BROTMAN, District Judge.

Presently before the court are the following motions: (1) plaintiff Wendall K. Littles' motion to dismiss all claims against defendants and plaintiff Shirley DiLoreto's motion to dismiss all claims for excessive use of force against defendants Borough of Oaklyn and Robert Kane [1]; (2) plaintiff Di-Loreto's motion to amend the complaint; (3) defendant Patricia Walsh's motion to amend her answer; (4) defendant Patricia Walsh's motion for summary judgment; and, (5) plaintiff DiLoreto's motion for summary judgment against Walsh, Kane, and Borough of Oaklyn.

## I. FACTS AND PROCEDURE

On June 6, 1987, Shirley DiLoreto, plaintiff (hereinafter "plaintiff"), was a passenger in a car driven by Wendall Littles. Defendant Robert Kane, a police officer in Oaklyn Township, claims that Littles' car was swerving and speeding at 75 miles per hour and that a high speed chase ensued. After bringing the car to a stop, the police officer approached the car. Officer Kane asserts that he did not know that anyone other than Littles was in the car when he first approached. He then saw plaintiff DiLoreto come up from a crouched position on the floor. Littles could not produce a registration for the car and had no insurance, and the police arrested him for driving under the influence of alcohol and a number of other charges.

Plaintiff DiLoreto was patted down to check for weapons or contraband, but nothing was found. *See* Deposition of R. Kane at 28.[2] She was then taken to the Oaklyn Police Station for questioning regarding the possibility that the car was stolen and that she was involved in that possible theft. Plaintiff was never charged with any offense as a result of the incident, and it was later discovered that the car was not stolen.

While at the station, plaintiff asked to use the bathroom.[3] Officer Kane called

---

**1.** The complaint alleges claims for excessive force based on the conduct of the police in approaching the car with guns drawn. Since plaintiffs seek to dismiss these claims with prejudice, there is no harm to defendants in granting the motions. Accordingly, the court will grant plaintiffs' motions to dismiss.

**2.** The testimony at the deposition was as follows:

Question: Let's go back to the station house after you had questioned her. At that point did you believe she had any weapons on? Answer: Through the pat down, no, we did not believe she had any specific weapons on her.

Question: Did you believe she had any contraband on her?
Answer: We did not know.
Question: There was nothing that would have indicated that; is that correct?
Answer: It's hard to say whether there was or there wasn't. Contraband can be hidden anywhere and it will not show on certain people. It's not a bulge in their pocket or a pocket sticking out.
Deposition of R. Kane at 28.

**3.** It appears that DiLoreto was pregnant at the time of the events at issue. *See* Deposition of S. DiLoreto at 223 ("Question: Did you mention the fact that his driving could hurt you or your baby? Answer: No, I did not."). This might

the Haddon Township police station to request that a matron be sent to accompany plaintiff. Officer Kane explained his actions in the following manner:

Question: At some point in time she requested to use the bathroom; is that correct?

Answer: It's my recollection that when we were there she asked and then on the way to there she asked and when we got there she asked. At that point it was pretty obvious she had to use the bathroom and at that point we did not know—we didn't have the computer look up on the tag to see whether it was or was not stolen. So we did not know whether she was going to be charged or not be charged at that point due to—if the car was stolen then she was going to be charged with the possession also. But we did not—I believe Mr. Littles said that it was his car or somebody in his family's vehicle but we did not know for sure. At that point I contacted Haddon Township and Patty Walsh was brought over to the police station so that Miss DiLoreto could go to the bathroom.

Question: Why did you make the decision that you had to have a female officer there?

Answer: Because number one, it was a possibility that she was going to be charged with the possession of the vehicle and that if she was retaining any contraband that it could be discovered at that point. I did not want her to dispose of contraband if she went into the bathroom by herself and I could not accompany her to the bathroom. That's why I had a female officer there. Of course we had a female in custody, so we had a female matron per se there.

Deposition of R. Kane at 29–30.

After being informed by her sergeant that there was a woman in custody in Oaklyn, Officer Walsh went to the Oaklyn Township police station. Upon her arrival, she inquired as to why she was there. Officer Tortaretto, a Haddon Township police officer who was present when the car was stopped and as plaintiff was taken into custody, told Officer Walsh that plaintiff had to use the bathroom. Deposition of P. Walsh at 9. No other reason for the need to accompany plaintiff was given. Deposition of P. Walsh at 10. Walsh accompanied plaintiff to the bathroom and stood by the sink watching plaintiff urinate. Deposition of P. Walsh at 15–16.[4] When asked in deposition whether there was any reason why she was observing plaintiff, Officer

explain in part the urgency of the repeated requests to use the bathroom.

4. The relevant testimony was as follows:

Answer: The sink is on the opposite side of the room.
Question: How far away?
Answer: Four foot?
Mr. Popjoy: Don't guess. If you know—
The Witness: I don't know.
Mr. Popjoy: If you can approximate.
Mr. Aimino: Can you have her testify?
Question: Can you give me an estimate?
Answer: Four to five feet maybe.
Question: Were you between the sink and the toilet?
Answer: I believe my back was on the sink.
Question: Did you give Ms. DiLoreto any instructions on what she was to do with her clothing?
Answer: No.
Question: I assume you watched her as she was using the toilet; is that correct?
Answer: Yes.
Question: Did you tell her she could not sit on the toilet?

Answer: No.
Question: Did you inspect the toilet after she was done using it?
Answer: Yes.
Question: Why is it that you did that?
Answer: I was looking for anything besides human waste.
Question: Why were you doing that?
Answer: I've been in police work long enough to know that females have a tendency to hide things in strange places.
Question: And what would have given you reason to believe that Ms. DiLoreto would have been hiding things in strange places?
Answer: She's a female.
Question: So just the fact that she was a female gave you the belief that she may have been hiding something; is that correct?
Answer: Yes.
Deposition of P. Walsh at 15–16. She further testified as follows:
Question: As she was actually using the toilet, did you turn your head or were you still observing her?
Answer: I was observing her.
Deposition of P. Walsh at 24.

Walsh replied, "[n]o." Deposition of P. Walsh at 11. Officer Walsh checked the toilet after plaintiff was through, but denies giving plaintiff any instructions regarding the removal of any of her clothing. She contends that plaintiff was wearing a long skirt so that only below the calf was visible. *See* Deposition of P. Walsh at 24. Officer Walsh asserts that she did not check plaintiff's undergarments nor touch her body. Finally, Officer Walsh conceded in her deposition that she had received no training as to accompanying women to the bathroom. Deposition of P. Walsh at 19.

According to plaintiff, the events occurred somewhat differently. Plaintiff alleges that Officer Walsh directed her to raise her dress up above her waist, Deposition of S. DiLoreto at 216, and inspected plaintiff's person and her underwear. Deposition of S. DiLoreto at 217. Walsh also inspected the toilet, Deposition of S. DiLoreto at 217, and told her that this was the "procedure." Deposition of S. DiLoreto at 223.

Officer Kane denies instructing Walsh to observe plaintiff urinate. Deposition of R. Kane at 33. He testified in his deposition as follows:

Question: Did you give Pat Walsh any instructions prior to her accompanying Miss DiLoreto into the bathroom?

Answer: What I recollect was that we did not know specifically what we had, that she had to go to the bathroom and I did not want any—whether there was any contraband, I didn't want any contraband flushed down the toilet.

Question: So you wanted her to observe Miss DiLoreto while she went to the bathroom; is that correct?

Answer: No, I did not. Alls [sic] I asked her to do was make sure that the toilet was not flushed and make sure there was no contraband sent down the toilet.

Deposition of R. Kane at 33. When asked the general custom regarding individuals who are not free to leave the police station and who want to use the bathroom, Officer Kane replied that there was no specific procedure and the decision depends on the seriousness of the situation. *See* Deposition of R. Kane at 35–36. He noted that plaintiff's situation was serious because it involved a possible stolen vehicle. Officer Kane also made the following statements in his deposition:

Question: Was it fair to say that at the time you decided to call the matron, the only charges you were contemplating would have been in relation to a possible stolen vehicle?

Answer: Correct.

Question: So you weren't contemplating any drug charges or any weapons charges at that point?

Answer: Not at that point, no.

Deposition of R. Kane at 30. *See* Deposition of R. Kane at 28 (indicating no basis for suspecting DiLoreto had weapons or contraband) (quoted *supra*, n. 2).

Plaintiff has also had the opportunity to depose John Laggy, who was the Chief of Police for the Borough of Oaklyn at the time of these events. He was "in total charge of the Department." Deposition of J. Laggy at 6. He further responded when asked whether it would have been consistent with the policy of the Borough of Oaklyn to search DiLoreto:

Answer: Under those circumstances, with the alleged investigation ongoing, that she might have been involved, yes, I would say so. I really believe that we're talking as a matter of policies. Policy is policy and, then, there's such a thing as common sense, too.

Deposition of J. Laggy at 16. He finally gave the following testimony as to the substance of the policy with respect to strip searching detainees:

Question: Do you remember, in June of 1987 or prior, did you have any kind of policy with respect to strip searching detainees?

Answer: To the best of my knowledge, no, there was no definite policy on strip searching detainees. I can only recall one incident where we did have a female searched. And, there were, at that time, 2 matrons with her. And we were looking for drug contraband....

Question: Were there ever any training courses on how to conduct a strip search in the Borough of Oaklyn?

Answer: In the Borough of Oaklyn? No.

Question: Were any instructions or orders given on how to conduct a strip search?

Answer: No.

Question: Were any documents or orders or written statements ever given in what to do when you accompany an individual into the Borough of Oaklyn's bathroom?

Answer: No.

Deposition of J. Laggy at 23–24.

Plaintiff seeks to correct the designation of the township by which Officer Walsh was employed. Plaintiff contends that Officer Walsh's acts constituted an unreasonable strip search and thus violated her fourth amendment right to be free from unreasonable searches. Plaintiff argues that Officer Kane is liable for the unconstitutional strip search because he ordered Officer Walsh to be present while plaintiff urinated. Plaintiff also asserts that the Borough of Oaklyn is liable because its strip search policy was unconstitutional as applied to her.

Defendant Walsh moves for summary judgment against plaintiff on the ground of qualified immunity. Plaintiff claims that Officer Walsh failed to raise qualified immunity as a defense.[5] These motions will be considered *seriatim*.

## II. DISCUSSION

### A. *Motion to Amend Complaint*

■ Leave to amend a complaint is "freely given when justice so requires." Fed.R.Civ.P. 15(c). An amendment may be denied, however, where there is "undue

delay, bad faith or dilatory motive on the part of the movant, [or] ... undue prejudice to the opposing party by virtue of allowance of the amendment...." *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962). Delay alone is not sufficient to deny a motion to amend; there must also be a showing of undue prejudice. *Heyl & Patterson International v. F.D. Rich Housing, Inc.*, 663 F.2d 419 (3d Cir.1981), *cert. denied sub nomine F.D. Housing, Inc. v. Government of the Virgin Islands*, 455 U.S. 1018, 102 S.Ct. 1714, 72 L.Ed.2d 136 (1982); *Leased Optical Departments v. Opti–Center, Inc.*, 120 F.R.D. 476, 479 (D.N.J.1988). The party claiming prejudice "must show that it was unfairly disadvantaged or deprived of the opportunity to present facts or evidence which it would have offered had the ... amendments been timely." *Heyl & Patterson*, 663 F.2d at 426, *cert. denied sub nomine F.D. Housing, Inc. v. Government of the Virgin Islands*, 455 U.S. 1018, 102 S.Ct. 1714, 72 L.Ed.2d 136 (1982).

■ In the instant case, no prejudice flows from the proposed amendment to the complaint. Officer Walsh has been defending against plaintiff's allegations since March 9, 1989, when she filed an answer which alleged "PATRICIA WALSH, while denying the allegations against Jane Doe, believes that she was the female officer who conducted the strip-search of the plaintiff, Shirley DiLoreto, hereby answers the Complaint as follows...." Answer, Cross-claim & Jury Demand (Filed March 9, 1989) at 2. Moreover, the Joint Final Pretrial Order specifically states "Plaintiff will seek leave to amend her complaint to correct the designation of Patricia Walsh from Oaklyn Officer to Haddon Township Officer." Joint Final Pretrial Order (Filed May 10, 1990) at 6.[6] The proposed amendment

---

5. In light of the pending motion to amend the complaint, the court directed the parties to address the following issue: "assuming that defendant Patricia Walsh has not raised the defense of qualified immunity as yet, can this defense be raised in an amended answer where the proposed amendment to the complaint is technical, specifically, where the designation of Patricia Walsh as an officer of the Borough of Oaklyn is corrected to designate her as an officer of Had-

don Township." Court's Letter to Counsel (July 3, 1990).

6. *The portion of the Joint Final Pretrial Order prepared by Officer Walsh further indicates the lack of surprise to her from the technical amendment.* Officer Walsh's section of the Joint Final Pretrial order states, with reference to whether she will seek to amend any pleadings, "None as to Patricia Walsh." Joint Final Pretrial Order (Filed May 10, 1990) at 12. *See*

is more properly considered as an amendment to conform to the evidence pursuant to Fed.R.Civ.P. 15(b), as the parties have been proceeding on the assumption that the Patricia Walsh named in the complaint as an officer of the Borough of Oaklyn is Officer Patricia Walsh of Haddon Township, the Patricia Walsh who has been defending for approximately one and a half years.

In the absence of any showing of prejudice to Officer Walsh, the court will grant plaintiff's motion to amend the designation of Officer Walsh so that she may be designated as an officer of Haddon Township. Accordingly, the court proceeds to consider the respective motions for summary judgment.

### B. *Summary Judgment Standard*

The standard for granting summary judgment is a stringent one. A court may grant summary judgment only when the materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Hersh v. Allen Prods. Co.*, 789 F.2d 230, 232 (3d Cir.1986); *Lang v. New York Life Ins. Co.*, 721 F.2d 118, 119 (3d Cir.1983). In deciding whether there is a disputed issue of material fact the court must view all doubt in favor of the non-moving party. *Meyer v. Riegel Prods. Corp.*, 720 F.2d 303, 307 n. 2 (3d Cir.1983), *cert. denied*, 465 U.S. 1091, 104 S.Ct. 2144, 79 L.Ed.2d 910 (1984); *Smith v. Pittsburgh Gage & Supply Co.*, 464 F.2d 870, 874 (3d Cir.1972). The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

Recent Supreme Court decisions mandate that "a motion for summary judgment must be granted unless the party opposing the motion can produce evidence which, when considered in light of that party's

burden of proof at trial, could be the basis for a jury finding in that party's favor." *J.E. Mamiye & Sons, Inc. v. Fidelity Bank*, 813 F.2d 610, 618 (3d Cir.1987) (Becker, J., concurring) (citing *Anderson*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202, and *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Moreover, once the moving party has carried its burden of establishing the absence of a genuine issue of material fact, "its opponent must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Thus, if the non-movant's evidence is merely "colorable" or is "not significantly probative," the court may grant summary judgment. *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2510–2511.

### C. *Defendant Walsh's Motion for Summary Judgment*

Plaintiff asserts that defendant Walsh may not rely on qualified immunity because Walsh failed to raise the defense in her answer to the complaint.

#### 1. Failure to Raise Qualified Immunity

Qualified immunity is an affirmative defense that is waived if not pleaded. *Doe v. Borough of Barrington*, 729 F.Supp. 376, 386 (D.N.J.1990) (citing *Gomez v. Toledo*, 446 U.S. 635, 640, 100 S.Ct. 1920, 1923, 64 L.Ed.2d 572 (1980)). *See* Fed.R.Civ.P. 8(c). Defendant Walsh did not raise the defense in her answer to the complaint. Accordingly, she has waived the defense.

Defendant Walsh offers two cases to support the contention that if a pretrial order or the pleadings "encompass" the defense at issue, then the defense has not been waived. *State Distrib., Inc. v. Glenmore Distilleries*, 738 F.2d 405, 410 (10th Cir.1984) (where defendants sought to raise issues of good faith and good cause and where pretrial order "identified as contested issues of fact" good faith and good cause); *Bull's Corner Restaurant v. Director of the Federal Emergency Manage-*

*also id.* at 6 ("No other amendments to the pleadings shall be made.").

*ment Agency,* 759 F.2d 500, 502 (5th Cir. 1985) (where a particular pleading was "taken as involving the exclusion at issue" because the exclusion helps define the "general condition of flooding" and the pleading referred to the general condition of flooding).

■ Defendant Walsh argues that the defense of qualified immunity was raised in the Joint Final Pretrial Order. She refers to the following passage, which is found under the heading "Statement of Legal Issues Presented" in her portion of the Joint Final Pretrial Order: "Whether Patricia Walsh may be personally liable for any alleged violation of plaintiff's constitutional rights under the factual circumstances presented." Even if one were to accept that it is permissible to raise qualified immunity for the first instance in the joint final pretrial order, the quoted passage fails to do so. The statement on which defendant Walsh relies is so vague and general that it does not put plaintiff on notice that a qualified immunity defense is being raised. The court concludes that the Joint Final Pretrial Order does not encompass a defense on the basis of qualified immunity.

### 2. Qualified Immunity in Amended Answer

■ Although the court concludes that defendant Walsh has not properly raised qualified immunity as a defense, she seeks to add the defense in an amended answer to be filed in response to the proposed amended complaint. The court requested that the parties brief whether qualified immunity could be raised in response to a technical amendment of the complaint. For the following reasons, the court concludes that the defense cannot be raised in this manner.

As a general rule, a defense that was available to the original complaint is waived if not raised. *See* Fed.R.Civ.P. 12(h); Fed.R.Civ.P. 8(c) ("a party *shall* set forth affirmatively ... [any] matter constituting an avoidance or affirmative defense") (emphasis added). Thus, "the filing of an amended complaint will not revive the right to present by motion defenses that were available but were not asserted in a timely fashion prior to amendment." 5A C. Wright & A. Miller Federal Practice and Procedure § 1388 at p. 736 (2d ed. 1990) (citation omitted); *id.* at § 1278. The failure to raise qualified immunity as a defense therefore operates as a waiver. *Doe,* 729 F.Supp. at 386; *O'Hagan v. Soto,* 565 F.Supp. 422, 427 (S.D.N.Y.1983). *See Kennedy v. City of Cleveland,* 797 F.2d 297, 300 (6th Cir.1986) ("failure to plead immunity may, at different stages of the litigation, work either a partial or complete waiver"), *cert. denied sub nomine Hanton v. Kennedy,* 479 U.S. 1103, 107 S.Ct. 1334, 94 L.Ed.2d 185 (1987); *Kelson v. City of Springfield,* 767 F.2d 651, 657 (9th Cir. 1985) (suggesting that defendants be permitted to raise defense of qualified immunity on remand where no answer had been filed, district court had improperly granted motion to dismiss, and plaintiffs were to be permitted to file amended complaint); *Troxler v. Owens–Illinois, Inc.,* 717 F.2d 530, 533 (11th Cir.1983) (failure to plead statutory immunity waived defense); *Rowley v. McMillan,* 502 F.2d 1326, 1332–33 (4th Cir.1974) (holding that defendant could not assert lack of personal jurisdiction in amended answer where defense was not raised in initial pleading because "unasserted defense available at the time of response to an initial pleading may not be asserted when the initial pleading is amended"); *Abady v. Macaluso,* 90 F.R.D. 690, 692 (E.D.Pa.1981) (same) (citing *Rowley* ). *Cf. Lucas v. United States,* 807 F.2d 414, 418 (5th Cir.1986) (no waiver of statutory defense from failure to plead in answer where defense was raised at "pragmatically sufficient time").

Although the court has some discretion in allowing the parties to amend pleadings, the instant case does not warrant the exercise of discretion in favor of permitting the amendment to the answer. Defendant Walsh did not raise the qualified immunity issue until the deadline for the filing of dispositive motions under the Second Scheduling Order had passed and after the entry of the Joint Final Pretrial Order. It

is simply too late in this litigation to raise the issue.

Officer Walsh presents a number of cases to support her view that her failure to raise qualified immunity did not waive the defense in this instance. All of these cases are distinguishable and none is controlling. In *Wycoff v. Menke,* 773 F.2d 983 (8th Cir.1985), *cert. denied,* 475 U.S. 1028, 106 S.Ct. 1230, 89 L.Ed.2d 339 (1986), Menke did not raise the statute of limitations as an affirmative defense in his answer to the complaint. *Id.* at 984. The court found that although the failure would ordinarily result in a waiver of the affirmative defense, it had not been waived because Menke had asserted the defense in a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6). *Id.* Defendant Walsh, however, never raised the issue of qualified immunity in a motion to dismiss. Although Walsh reserved, in her answer to the complaint, the right to move to dismiss on the grounds of failure to state a claim upon which relief can be granted, she never made such a motion on the basis of qualified immunity. *See Batiste v. Burke,* 746 F.2d 257 (5th Cir.1984) (permitting qualified immunity to be raised in motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6)).

In *DelCostello v. International Bhd. of Teamsters,* 588 F.Supp. 902 (D.Md.1984), *aff'd,* 762 F.2d 1219 (4th Cir.1985), the court recognized an exception in allowing defendants to raise a statute of limitations defense in a summary judgment motion. The court noted that the parties had "examined the issue of the applicable statute of limitations for more than three years." *Id.* at 906. Here, defendant Walsh has raised the qualified immunity issue for the first time on the eve of trial.

In *Bishop v. State Bar of Texas,* 791 F.2d 435 (5th Cir.1986), the Fifth Circuit found no reversible error where the defendant was permitted to raise qualified immunity in a motion for summary judgment after the trial court had dismissed plaintiff's motion for an injunction and invited the defendant's motion; it appears that no answer had been filed, and the plaintiff filed no response in the two months he was

given to respond. *Id.* at 438 n. 2. The Fifth Circuit therefore found no error in considering the qualified immunity defense. Here, there was no immediate motion for injunctive relief such that defendants did not have an adequate opportunity to file an answer raising the defense. *Bishop* is a unique case with no application here.

### 3. Unavailability of Qualified Immunity

■ Even if defendant Walsh had not waived the defense, or if she were permitted to raise it in an amended answer, the qualified immunity defense would not be available to her because the law concerning the unconstitutionality of such searches was so clearly established that no reasonable officer could have believed that Walsh's conduct was constitutional.

With respect to qualified immunity, plaintiff must show that defendants violated some clearly established right. *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The Supreme Court further refined *Harlow*'s clearly established law standard in *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987):

> The operation of this standard, however, depends substantially upon the level of generality at which the relevant "legal rule" is to be identified. For example, the right to due process of law is quite clearly established by the Due Process Clause, and thus there is a sense in which any action that violates that Clause (no matter how unclear it may be that the particular action is a violation) violates a clearly established right.

*Id.* at 639, 107 S.Ct. at 3038. The Supreme Court in *Anderson* went on to explain:

> our cases establish that the right the official is alleged to have violated must have been "clearly established" in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.

*Id.* at 640, 107 S.Ct. at 3039.

Judge Barry noted in a recent case, *Ryan v. Burlington County,* 708 F.Supp. 623 (D.N.J.), *aff'd,* 889 F.2d 1286 (3d Cir.

1989), that summary judgment in favor of a defendant on qualified immunity grounds should be denied "if a jury could find that the defendant could not reasonably have believed that his or her actions were lawful," because it "is the objective reasonableness of a defendant's actions that governs; what the defendant actually believed or did not believe is irrelevant to the qualified immunity analysis." *Id.* at 628 (citations omitted), *aff'd,* 889 F.2d 1286 (3d Cir. 1989). *See also Washington v. District of Columbia,* 685 F.Supp. 264, 274 (D.D.C. 1988) (liability not matter of whether defendant "right or wrong" in making search; "stiffer substantive standard must be imposed"); *Burns v. Loranger,* 907 F.2d 233, 236 (1st Cir.1990) (appellate court will deny a qualified immunity claim "if a reasonable official situated in the same circumstances should have understood that the challenged conduct violated" a clearly established right).

If the events in this case occurred in 1989 or 1990 instead of 1987 the actions of Patricia Walsh would obviously constitute a violation of the fourth amendment's protection against unreasonable searches and seizures. In *Wilkes v. Borough of Clayton,* 696 F.Supp. 144 (D.N.J.1988), Chief Judge Gerry granted defendants' motion for summary judgment on grounds of qualified immunity because as of May 1985 there was no "clearly established constitutional right of arrestees in police custody to be free from visual observation while using bathroom facilities." *Id.* at 146. Chief Judge Gerry then clearly established that right, holding that "arrestees may reasonably expect to defecate, urinate and change sanitary napkins or tampons without direct visual observation by law enforcement officers, unless some justification for the intrusion is demonstrated." *Id.* at 147–148. The question in this case turns on whether it was clearly established in June 1987 that viewing a detainee urinate without justification was unconstitutional.

In *O'Brien v. Borough of Woodbury,* 679 F.Supp. 429 (D.N.J.1988), this court distinguished *O'Brien* from *Davis v. Camden,* 657 F.Supp. 396 (D.N.J.1987), and found that the law prohibiting blanket strip/body cavity searches of inmates was clearly established by December 1985. In *Davis,* where the events had taken place in May 1984, the Judge Cohen held that the law at issue "was not, in May, 1984, so clearly unconstitutional that the defendants reasonably should have known that they were obligated not to implement it." 657 F.Supp. at 401–02. Judge Cohen noted the "relatively recent vintage of most strip search cases," *id.,* and the fact that the Third Circuit Court of Appeals had not yet ruled on the constitutionality of blanket strip search policies. *Id.* By contrast, in *O'Brien* the defendants "had a minimum of eighteen months more than the defendants in *Davis* to inform themselves of the prevailing case law outlawing the searches in question." 679 F.Supp. at 435.

In addition, as noted in *O'Brien,* the New Jersey statute concerning strip searches of inmates was amended in December of 1985 to require probable cause. N.J.A.C. § 10A:31–3.12(b)(2)(ix) ("Under no circumstances, may a body cavity search be conducted, unless the officer in charge of the station house is satisfied that probable cause exists that the person is concealing contraband in his or her body cavity.") Although *O'Brien* and N.J.A.C. § 10A:31–3.12(b)(2)(ix) are concerned with prison inmates, it is not unreasonable for detainees to expect at least the same amount of protection regarding their constitutional rights.

In *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), the Court interpreted earlier cases to mean that it is unnecessary for a particular act previously to have been held unlawful; "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of preexisting law the unlawfulness must be apparent." *Id.* at 640, 107 S.Ct. at 3039. The Third Circuit has found that "*Anderson* thus supports our precedent interpreting the 'clearly established' standard as 'requiring some but not precise factual correspondence [between the relevant precedents and the conduct at issue]

and demanding that officials apply general well developed legal principles.'" *Stoneking v. Bradford Area School Dist.*, 856 F.2d 594 (3d Cir.1988) (citing *People of Three Mile Island v. Nuclear Regulatory Commissioners*, 747 F.2d 139, 144 (3rd Cir. 1984)), *vacated on other grounds sub nomine Smith v. Stoneking*, — U.S. —, 109 S.Ct. 1333, 103 L.Ed.2d 804 (1989). *See also Ryan*, 708 F.Supp. at 628, *aff'd*, 889 F.2d 1286 (3d Cir.1989).

An additional factor supports the conclusion that the law concerning the action involved here was clearly established by June of 1987. *Davis v. Camden* was published before the events in this case occurred and thus placed the defendant on notice as to the unconstitutionality of unreasonable strip searches. 657 F.Supp. at 396. The *Davis* court held that in order for a strip search to be constitutional there must be reasonable suspicion that the arrestee is concealing weapons or contraband; such suspicion could arise either from the specific circumstances of the arrestee or the arrest, or from the nature of the offense charged. *Id.* at 400–401. *Accord Cruz v. Finney County, Kansas*, 656 F.Supp. 1001 (D.Kan.1987) (finding, in published opinion filed on March 19, 1987, that blanket strip search policy applicable to all arrestees was unconstitutional). *See generally* Annotation, *Fourth Amendment as Prohibiting Strip Searches of Arrestees or Pretrial Detainees*, 78 A.L.R.Fed. 201 (1986). The law was clearly established in June of 1987 such that reasonable officials would have realized that the conduct here was unconstitutional. Qualified immunity is not available as a defense based on the undisputed facts in this case.

### D. *Plaintiff's Motion for Summary Judgment*

■ In order to find that plaintiff is entitled to recover under § 1983, the court must find that the official's conduct resulted in a "deprivation of [plaintiff's] rights, privileges, or immunities secured by the Constitution [or] laws" of the United States. 42 U.S.C. § 1983. Plaintiff contends that her fourth amendment right to be free from unreasonable searches has

been violated. In an earlier case, this court concluded that viewing an arrestee change a sanitary napkin is considered a "search" under the Fourth Amendment, *Wilkes v. Borough of Clayton*, 696 F.Supp. 144, 147 (D.N.J.1988), because the arrestee has a "reasonable expectation of privacy." *Id.* (citing *Katz v. United States*, 389 U.S. 347, 360, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967)). As the court then observed, "[o]ne strains to conjure up an activity more private than the changing of a sanitary napkin." *Id.* In its analysis, the court approved of a Fifth Circuit decision which noted that "[t]here are few activities in our society more personal or private than the passing of urine." *Id.* (citing *National Treasury Employees Union v. Raab*, 816 F.2d 170, 175 (5th Cir.1987), *vacated in part on other grounds*, 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989)). The court also noted *Capua v. City of Plainfield*, 643 F.Supp. 1507, 1514 (D.N.J.1986), which stated that "[t]he act [of urination] itself, ..., is traditionally private." *Id.* (citing *Capua* ). *See also Wilkes* at 149 ("we have little doubt that arrestees forced to defecate and urinate while being viewed by Borough police suffer a serious invasion of privacy"). Defendant Walsh's visual observation of plaintiff while urinating was a search for purposes of fourth amendment analysis. This is true even taking the facts are as defendant Walsh alleges, i.e., even if defendant Walsh neither touched plaintiff's body nor checked her undergarments nor asked plaintiff to disrobe.

■ As was noted in the discussion of qualified immunity, it was clearly established that a search will be considered a violation of the fourth amendment if it is unreasonable. *Bell v. Wolfish*, 441 U.S. 520, 558, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447 (1979). In *Bell*, prison inmates were subjected to visual inspections of their bodies after each visit with a person from the outside. *Id.* at 558, 99 S.Ct. at 1884. The Court found that a determination as to reasonableness "requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the

scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Id.* at 559, 99 S.Ct. at 1884. Police must have probable cause to believe that a person possesses weapons or contraband before a strip search can occur.[7] The relevant inquiry at this juncture is whether the police had any justification for their visual observation of plaintiff which would render the search reasonable.

■ Defendants offer several explanations for the search. Defendant Walsh stated that she was accompanying plaintiff to the bathroom to prevent plaintiff from harming herself. She also stated that she checked the toilet for "anything besides human waste" because plaintiff was female. Walsh stated that she had no information about plaintiff except that she was to accompany plaintiff to the bathroom. According to Officer Laggy, the reason to have a detainee accompanied to the bathroom was to make sure the detainee did not harm herself or try to escape.

In his deposition, Officer Kane explained why he had Officer Walsh brought over to the station: "it was a possibility that she was going to be charged with the possession of the vehicle and that if she was retaining any contraband that it could be discovered at that point. I did not want her to dispose of contraband if she went into the bathroom by herself and I could not accompany her to the bathroom." Deposition of R. Kane at 30. He stated that no drug charges or weapons charges were being contemplated against plaintiff at that time.

A general desire to prevent a detainee from harming herself is insufficient as a justification for visually observing her use of bathroom facilities. Rather "[o]nly when an arrestee's behavior, emotional or physical condition, or past record of self-harm are such as to engender a. reasoned and articulable basis for maintaining direct visual oversight at all times is a viewing of an arrestee's bathroom use constitutionally justifiable." *Wilkes,* 696 F.Supp. at 150 (footnote omitted). Here, neither Officer Laggy nor Officer Walsh explain why there was a need to accompany plaintiff to the bathroom in order to prevent her from hurting herself. Defendant Walsh could not possibly have had any particularized suspicion toward plaintiff since Walsh knew nothing about plaintiff's "behavior, emotional or physical condition, or past record of self-harm"; Walsh did not even know why plaintiff had been detained. In fact, Walsh indicated that she would behave in a similar fashion towards any female since the fact that a detainee was a female was reason enough for her to suspect that the detainee was hiding something. Preventing plaintiff from harming herself was not a sufficient justification for an invasion of plaintiff's privacy in this situation.

In addition, there was not reasonable suspicion that plaintiff possessed weapons because the police already had already performed a pat search for weapons when they stopped the vehicle. Officer Kane stated in his deposition that, as a result of the pat search, the police believed plaintiff had no weapons on her person. If Defendant Walsh had been concerned that plain-

---

7. In *Ernst v. Borough of Fort Lee,* 739 F.Supp. 220, 224 (D.N.J.1990), Judge Barry made the following observation:

"The courts of this district have not stood alone in invalidating strip searches which are undertaken without reasonable suspicion to believe that an arrestee is concealing a weapon or drugs or harboring contraband. Indeed, as both Judges Cohen and Brotman noted in their consideration of this issue, no less than seven United States Courts of Appeals have invalidated such searches under similar circumstances. *See Weber v. Dell,* 804 F.2d 796, (2d Cir.1986), *cert. denied sub nomine County of Monroe v. Weber,* 483 U.S.

1020 [107 S.Ct. 3263, 97 L.Ed.2d 762] (1987); *Jones v. Edwards,* 770 F.2d 739 (8th Cir.1985); *Stewart v. County of Lubbock,* 767 F.2d 153 (5th Cir.1985), *cert. denied,* 475 U.S. 1066 [106 S.Ct. 1378, 89 L.Ed.2d 604] (1986); *Giles v. Ackerman,* 746 F.2d 614 (9th Cir.1984), *cert. denied,* 471 U.S. 1053 [105 S.Ct. 2114, 85 L.Ed.2d 479] (1985); *Hill v. Bogans,* 735 F.2d 391 (10th Cir.1984); *Mary Beth G. v. City of Chicago,* 723 F.2d 1263 (7th Cir.1983); *Logan v. Shealy,* 660 F.2d 1007 (4th Cir.1981), *cert. denied,* 455 U.S. 942 [102 S.Ct. 1435, 71 L.Ed.2d 653] (1982)." Visual observation of urination by police is treated like a strip search. *Wilkes* at 149.

tiff possessed weapons, assuming she did not know that a pat search had been conducted, she could have administered a pat search herself. A strip search to look for weapons, however, is patently unreasonable.

Defendant Kane alleges that there was reasonable suspicion that plaintiff possessed contraband. Defendant Kane's Brief at 6. Kane asserts that the way the events unfolded created a suspicion that plaintiff possessed the registration belonging to the real owner of the car.[8] The court suspects that the asserted basis for the search, i.e. to look for a registration belonging to a stolen car, is a pretext.[9] Even if one accepts that the search was conducted to look for the registration, such a justification is not objectively reasonable. *See United States v. Hawkins*, 811 F.2d 210, 214 (3d Cir.1987) (fourth amendment focuses on objective rather than individual officer's subjective motives). The police had not even yet determined that the car was stolen. Moreover, if defendant Walsh's portrayal of the law were accurate, police officers would be free to require any person stopped for a minor traffic offense who happened not to have his or her vehicle registration card to submit to a strip search. The wake of this argument is simply too broad. If the police were concerned that the car was stolen, they could have checked the vehicle identification number. It was not reasonable to subject an detainee to a visual strip search on the basis of a mere suspicion that a car in which the detainee was a passenger was stolen.

The strip searches in *O'Brien* were found unconstitutional where plaintiffs had been arrested for petty disorderly offenses

and where the searches occurred "prior to any determination by a neutral and detached magistrate that their arrest or continued detention was supported by probable cause." *O'Brien*, 679 F.Supp. at 434. Here, plaintiff was not formerly charged with any crime, nor were the police contemplating any charges that could have justified the search at issue. She was merely a passenger in a swerving car where the driver was intoxicated and could not produce his registration. Thus, neither defendant Walsh nor defendant Kane can sufficiently justify the invasion of plaintiff's privacy and personal rights. This court finds that defendant Kane and defendant Walsh are liable for the unreasonable strip search of plaintiff DiLoreto.

### E. *Plaintiff's Motion for Summary Judgment Against the Borough of Oaklyn*

The Borough of Oaklyn ("Oaklyn") is liable under 42 U.S.C. § 1983 only if the Borough caused the constitutional deprivation. *Monell v. Dept. of Social Services of New York*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Thus, "it is when execution of a [municipality]'s policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the [municipality] as an entity is responsible under § 1983." *Id.* at 694, 98 S.Ct. at 2037. The municipality can be held liable even when such a custom or policy "has not received formal approval through the body's official decisionmaking channels." *Id.* at 690–91, 98 S.Ct. at 2036. Thus, a borough is liable if the borough has a policy pursuant to which the unconstitutional act occurred.

---

**8.** Kane asserts the following:
the high speed chase at 4:30 a.m., the obvious attempt by Littles to escape, the need for the blockade, the surreptitious behavior by plaintiff in her sudden emergence from the floor of the car as well as plaintiff's repeated insistence to use the bathroom, the failure of Littles' and DiLoreto to produce registration and insurance for the vehicle, Mr. Littles' intoxication and the odor of alcohol on plaintiff's breath and the fact that the ownership of the vehicle remained in doubt even during plaintiff's use of the bathroom, led to the reason-

ableness of defendant Kane's suspicion that plaintiff was bent on discarding evidence. Defendant Kane's Brief at 6.

**9.** *See* Comment, *Pretext Searches and the Fourth Amendment: Unconstitutional Abuses of Power*, 137 U.Pa.L.Rev. 1791, 1802 n. 65 (1989) (arguing that officials may not use minor offense as basis for search for evidence of other crimes for which there is no reasonable suspicion or probable cause, and discussing pretexts in context of traffic violations).

A municipality may also be liable for a failure to train its employees. The Supreme Court recently held that "[o]nly where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." *City of Canton v. Harris*, 489 U.S. 378, 109 S.Ct. 1197, 1205, 103 L.Ed.2d 412 (1989). The ultimate question is "[w]ould the injury have been avoided had the employee been trained under a program that was not deficient in the identified respect?" 109 S.Ct. at 1206. In *City of Canton*, the Supreme Court set forth the following as an example:

> city policy makers know to a moral certainty that their police officers will be required to arrest fleeing felons. The city has armed its officers with firearms, in part to allow them to accomplish this task. Thus, the need to train officers in the constitutional limitations on the use of deadly force can be said to be 'so obvious,' that the failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights.

*Id.* 109 S.Ct. at 1205 n. 10. *See Doe*, 729 F.Supp. 376 (granting summary judgment for plaintiff for municipality's failure to train officers as to confidentiality of private medical information of arrestees).

Oaklyn argues that there is no established policy in the police department regarding accompanying individuals detained by the police to the bathroom. In his deposition Officer Kane noted that he is unaware of any policy concerning the use of the bathroom and that nobody ever discussed the subject with him. He stated that he decides how to behave depending on the situation. Officer Laggy, the Chief of Police in Oaklyn at the time of the events, stated that he was in total charge of the department and that he never made any written policies regarding the use of the bathroom by detainees; "to the best of my knowledge, no, there was no definite policy with respect to strip searching detainees." Deposition of J. Laggy at 24. When asked what policy would apply in plaintiff's situation, Laggy replied, "Under those circumstances, with the alleged investigation ongoing, that she might be involved, yes, I would say [she should be accompanied to the bathroom]. I really believe that we're talking as a matter of policies. Policy is policy and, then, there's such a thing as common sense, too." Deposition of J. Laggy at 16.

According to Officer Laggy's understanding, persons detained by the police are technically under arrest and they should be accompanied by an officer should they need to use the bathroom. According to this rationale, every detainee would be subjected to visual observation while urinating regardless of the offense the detainee is being charged with (if the detainee is being charged at all) and with no concern for the detainee's particular situation or the circumstances of the arrest. Police need reasonable cause to search a detainee and this policy, or deliberate lack thereof, fails to meet the constitutional standard.

No formal training regarding accompanying detainees to the bathroom was in place in Oaklyn. At deposition, Officer Walsh was asked if she had ever received training regarding accompanying detainees to the bathroom. Walsh responded that she had not. Officer Laggy stated that there were never any training courses or instructions given concerning how to conduct a strip search, nor were any written statements distributed regarding what an officer should do when accompanying a detainee to the bathroom.

As can be seen from the large number of cases discussing the issue, strip searching by police and accompanying detainees to the bathroom is not an uncommon occurrence. It is something that police must confront daily and an area in which they should receive training. Police officers should be aware of the limits placed on their actions by the Constitution. The Borough has a responsibility to implement policies that are consistent with the Constitution and to train its officers accordingly. It is not enough for the Borough to say that it is not liable because it does not have

a formal policy. Having no policy is itself a policy, and in this case, it is an unconstitutional policy. By not creating and implementing a policy and not training its employees regarding accompanying detainees to the bathroom, the Borough has expressed deliberate indifference to the fourth amendment rights of detainees and specifically to the rights of Shirley DiLoreto.

### F. *Remedies*
#### 1. Injunctive Relief

■ Plaintiff requests that this court enjoin defendants from engaging in strip searches of detainees without probable cause. Plaintiff has failed to show any likelihood that she is likely to be subjected to strip searches in the future, and therefore she lacks standing to seek injunctive relief. *City of Los Angeles,* 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983).

#### 2. Punitive Damages

■ Punitive damages are available under 42 U.S.C. § 1983. *Smith v. Wade,* 461 U.S. 30, 35, 103 S.Ct. 1625, 1629, 75 L.Ed.2d 632 (1983). Plaintiff cannot recover punitive damages against Oaklyn because municipalities are immune from liability for punitive damages under 42 U.S.C. § 1983. *Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 271, 101 S.Ct. 2748, 2762, 69 L.Ed.2d 616 (1981). Plaintiff may recover punitive damages against a defendant whose conduct evidenced an "evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith* 461 U.S. at 56, 103 S.Ct. at 1640.

■ There is clearly sufficient evidence to support an award of punitive damages; to suggest that it was objectively reasonable to strip search a detainee for no other reason than the fact that she was a woman alone would support such a finding. *See also* Deposition of P. Walsh at 24 (indicating no reason to observe plaintiff while seated on toilet). Nonetheless, the court is compelled to deny plaintiff's motion for summary judgment to the extent that she seeks an award of punitive damages

against the individual defendants. Defendants have produced sufficient evidence which, if viewed in the light most favorable to them, could allow a finder of fact to conclude that their conduct did not rise to the level required for punitive damages. Accordingly, it is for the finder of fact to assess whether punitive damages are appropriate in this case.

### CONCLUSION

For the foregoing reasons, the court will deny the motions of defendants for summary judgment and will grant plaintiff Littles' motion to dismiss with prejudice all of his claims. Likewise, the court will dismiss with prejudice plaintiff DiLoreto's claims for excessive force. Plaintiff DiLoreto's claims for injunctive relief shall be dismissed for lack of standing, and her motion for summary judgment as to the punitive damages shall be denied. It will be for the finder of fact to assess whether punitive damages are warranted. Finally, the court will grant plaintiff DiLoreto's motion for summary judgment as to the claims under the fourth amendment for the strip search.

The court is dismayed that there has been so little progress in educating police officers as to the constitutionality of strip-searching detainees and arrestees since this court's decision in *O'Brien.* It is unfortunate that so many boroughs in this state appear to have adopted a policy of non-acquiescence to the constitutionally mandated norms. This opinion signals that such a policy, if it exists, will not be countenanced by this court.

An appropriate order will be entered.

### ORDER

This matter having come before the court on the following motions:

(1) plaintiff Wendall K. Littles' motion to dismiss all claims against defendants;

(2) plaintiff Shirley DiLoreto's motion to dismiss all claims for excessive use of force against defendants Borough of Oaklyn and Robert Kane;

(3) plaintiff DiLoreto's motion to amend the complaint;

(4) defendant Patricia Walsh's motion to amend her answer to include the defense of qualified immunity in response to plaintiff DiLoreto's motion to amend the complaint;

(5) defendant Patricia Walsh's motion for summary judgment; and

(6) plaintiff DiLoreto's motion for summary judgment against defendants Patricia Walsh, Robert Kane, and Borough of Oaklyn; and

The court having considered the submissions of the parties; and

For the reasons set forth in the court's opinion of this date;

IT IS on this 20th day of August, 1990 hereby

ORDERED that:

(1) plaintiff Wendall K. Littles' motion to dismiss all claims against defendants IS GRANTED and such claims ARE DISMISSED WITH PREJUDICE;

(2) plaintiff Shirley DiLoreto's motion to dismiss all claims for excessive use of force against defendants Borough of Oaklyn and Robert Kane IS GRANTED and such claims ARE DISMISSED WITH PREJUDICE;

(3) plaintiff DiLoreto's motion to amend the complaint IS GRANTED and plaintiff shall file an amended complaint within ten (10) days of the entry of this order;

(4) defendant Patricia Walsh's motion to amend her answer to include the defense of qualified immunity in response to plaintiff DiLoreto's motion to amend the complaint IS DENIED;

(5) defendant Patricia Walsh's motion for summary judgment IS DENIED; and

(6) plaintiff DiLoreto's motion for summary judgment against defendants Patricia Walsh, Robert Kane, and Borough of Oaklyn is GRANTED IN PART and DENIED IN PART in that (a) plaintiff's motion for summary judgment IS GRANTED and SUMMARY JUDGMENT IS ENTERED in favor of plaintiff on her fourth amendment claim involving the strip search, (b) plaintiff's motion for summary judgment as to her claim for injunctive relief IS DENIED and the claim for injunctive relief IS DIS-MISSED WITH PREJUDICE FOR LACK OF STANDING, and (c) plaintiff's motion for summary judgment as to claims for punitive damages IS DENIED.

No costs.